UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No.: 14-10463-399 |
| | ) | Honorable Barry S. Schermer |
| NATIONAL VINYL PRODUCTS, INC. | ) | Chapter 11 Proceeding |
| | ) | |
| Debtor. | ) | Hearing Date: May 20, 2014 |
| | ) | Hearing Time:  11:00 a.m. |
| | ) | Hearing Location:  5 North |
| | ) | |
| | ) | Motion No. _____ |
| | ) | |
| | ) | Robert E. Eggmann, Esq. |
| | ) | Thomas H. Riske, Esq. |
| | ) | Desai Eggmann Mason LLC |
| | ) | 7733 Forsyth Blvd., Ste. 2075 |
| | ) | St. Louis, Missouri 63105 |
| | ) | (314) 881-0800 |
| | ) | reggmann@demlawllc.com |
| | ) | triske@demlawllc.com |

**AFFIDAVIT OF RAYMOND O. WALTER
IN SUPPORT OF CERTAIN FIRST DAY MOTIONS AND APPLICATIONS**

Raymond O. Walter, being duly sworn on oath, deposes and says:

1. I am the President of National Vinyl Products, Inc. ("**Debtor**"). As the President, I am familiar with the day-to-day operations, business affairs, and books and records of Debtor.

2. On May 19, 2014 ("**Petition Date**"), Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Eastern District of Missouri.  Debtor intends to continue in the possession of its properties and the management of its business as debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed, and no official committee of creditors or equity interest holders has been established in this Chapter 11 case.  In order to enable Debtor to operate effectively and to avoid the adverse effects of the Chapter 11 filing, Debtor will request various types of relief in "first day" applications and motions filed with the Court.

7441667v2

3. I submit this affidavit in support of the first day applications and motions in the above captioned Chapter 11 case. Any capitalized term not expressly defined herein shall have the meaning ascribed to that term in the relevant first day motion or application. Except as otherwise indicated, all facts set forth in this affidavit are based upon my personal knowledge, my review of relevant documents, or my opinion, based upon my experience and knowledge of the Debtor's operations and financial condition or information reported to me in the course of my duties by the Debtor's officers, agents, or employees. If I were called upon to testify, I could and would testify competently to the facts set forth herein. I am authorized to submit this affidavit.

4. Part I of this affidavit describes Debtor's business and the circumstances surrounding the filing of Debtor's Chapter 11 petition. Part II sets forth the background of the prepetition secured debt, and Part III sets forth the relevant facts in support of Debtor's various first day applications and papers filed concurrently herewith.

## I. BACKGROUND

5. National Vinyl Products, Inc. ("National Vinyl" or "Debtor") is a Missouri corporation that manufactures custom vinyl products including vinyl pouches, holders, binders and contract packaging. National Vinyl started operation in 1989 after Ray Walter decided to resign his position as Vice President in charge of manufacturing with Quality Business Accessories after 25 years of service. Mr. Walter met Mr. Trautman who became his financial backer for the equipment and helped National Vinyl get a line of credit with the Bank of Ste. Genevieve. National Vinyl's first sales came from a leather company in Ste. Genevieve. Later National Vinyl began making bank products for National Business Products which introduced National Vinyl Products to the check industry. The first customer of National Vinyl was Clarke

2

7441667v2

American who was a large enough check printer to get National Vinyl going and begin making a profit.

6. In National Vinyl's second year of operation, Clarke American merged with another large check printer and National Vinyl was forced to expand into a larger building. Mr. Trautman built National Vinyl a 39,000 sq. ft. building in Ste. Genevieve in 1991 and, with his help, National Vinyl purchased additional equipment and National Vinyl began production in its new facility. National Vinyl added the largest check printer shortly after moving into the new building. National Vinyl started increasing sales with brokers in the industry and we grew double digits over the next several years. In 2007 Clarke American purchased another major check printer, Harland, and National Vinyl expanded again. Harland manufactured their own products so we were asked to purchase all the equipment and become the sole supplier to the new company. At this point National Vinyl's sales totaled $13,000,000 in 2008.

7. In 2009, after the attack on the Twin Towers, sales began to drop dramatically. Much of the sales to the binder and catalog industry that National Vinyl supplied disappeared. Many in the industry believe companies who previously had sales meetings with suppliers and customers found other ways to conduct business. The bank industry also began to lose market due to the decline of the business and personal checks being replace by computer banking and debit card use. Like many other companies in our industry, National Vinyl struggled with reduced sales and profits. Our bank at the time was First Bank and they too, were having financial troubles and National Vinyl was forced to find another bank. It took two years to find National Vinyl's current bank, Midland States Bank. National Vinyl struggled with reduced sales and profits until cash flow became our biggest problem.

3

7441667v2

8. National Vinyl started working on reorganizing the company by reducing overhead in 2013. Our cash flow became an increasing problem throughout this process and in early 2014 we were unable to make our bank commitment. A plan to move from our current building was submitted to the bank and we began moving equipment in March. National Vinyl is making money in 2014 and, when the move into a smaller building is completed, our profits will increase by reducing more overhead. Considering the foregoing, National Vinyl believes that a Chapter 11 reorganization is its best business decision for its future.

9. The Debtor currently employs approximately 104 people.

## II.    MOTIONS AND APPLICATIONS

10. An important element of Debtor's successful Chapter 11 case is approval of each of Debtor's motions and applications submitted concurrently herewith. Factual information in support of such orders is provided below and in the applications and motions filed concurrently herewith.

### Retention of Desai Eggmann Mason LLC

11. Continued representation of Debtor by its counsel, Desai Eggmann Mason LLC ("DEM"), is critical to the success of Debtor's Chapter 11 proceeding because DEM is uniquely familiar with Debtor's business and legal affairs as more fully set forth in the Application for the retention of DEM and Affidavit of Robert E. Eggmann.

12. Debtor selected the firm of DEM as attorneys because of the firm's experience and knowledge in the field of debtors' and creditors' rights and business reorganizations under Chapter 11 of the Bankruptcy Code.

13. Debtor desires to employ the firm of DEM under a general retainer because of the extensive legal services that will be required in connection with the Chapter 11 case.

4

7441667v2

14. The services of attorneys under a general retainer are necessary in order to enable Debtor to faithfully execute its duties as debtor in possession. Subject to further order of this Court, DEM will be required to render, among others, the following services to Debtor:

    a. Advising Debtor with respect to their rights, power and duties in this case;

    b. Assisting and advising Debtor in its consultations with any appointed committee relative to the administration of this case;

    c. Assisting Debtor in analyzing the claims of creditors and negotiating with such creditors;

    d. Assisting Debtor with investigation of the assets, liabilities and financial condition of Debtor and reorganizing Debtor's businesses in order to maximize the value of Debtor's assets for the benefit of all creditors;

    e. Advising Debtor in connection with the sale of assets or business;

    f. Assisting Debtor in its analysis of and negotiation with any appointed committee or any third party concerning matters related to, among other things, the terms of a plan of reorganization;

    g. Assisting and advising Debtor with respect to any communications with the general creditor body regarding significant matters in this case;

    h. Commencing and prosecuting necessary and appropriate actions and/or proceedings on behalf of Debtor;

    i. Reviewing, analyzing or preparing, on behalf of Debtor, all necessary applications, motions, answers, orders, reports, schedules, pleadings and other documents;

    j. Representing Debtor at all hearings and other proceedings;

    k. Conferring with other professional advisors retained by Debtor in providing advice to Debtor; and

    l. Performing all other necessary legal services in this case as may be requested by Debtor in these Chapter 11 proceedings; and

    m. Assisting and advising Debtor regarding pending arbitration and litigation matters in which Debtor may be involved, including continued prosecution or defense of actions and/or negotiations on Debtor's behalf.

15. The firm of DEM has indicated a willingness to act on behalf of Debtor.

5

7441667v2

16. To the best of Debtor's knowledge, Robert E. Eggmann, and the other members, counsel, and associates of the firm of DEM (i) do not have any connection with Debtor, its affiliates, creditors, or any other parties in interest, or their respective attorneys and accountants, (ii) are "disinterested persons," as that term is defined in Section 101(14) of the Bankruptcy Code, and (iii) do not hold or represent any interest adverse to the estate, except as set forth herein and in the affidavit and statement of Robert E. Eggmann, a partner of DEM, filed concurrently herewith.

**Cash Collateral**

17. The Debtor requires the use of Cash Collateral to continue its business operations and to pay its regular daily expenses, including employees' wages, utilities, and its other costs of doing business.

18. The Debtor requires cash collateral to meet post-petition payroll, to pay necessary business expenses, and to continue its operations. A Monthly Budget, showing the amount of funds needed to maintain Debtor's operations until the entry of a final order permitting use of cash collateral, is included as Exhibit A to the Motion to Approve Use of Cash Collateral.

19. The Debtor does not have sufficient available sources of working capital and financing to carry on the operation of its business without use of the existing credit facility with Midland States Bank (the "**Credit Facility**") and the use of the Cash Collateral. The Debtor's ability to preserve its relationship with vendors and suppliers, to pay its employees, and to otherwise finance its operations, is essential to the Debtor's continued viability.

20. Absent the requested relief, the Debtor will be unable to pay its payroll and payroll expenses, operating expenses, and to otherwise operate its business and preserve its

7441667v2

assets. Immediate and irreparable harm to the Debtor's business and value of its estate will occur absent the relief requested herein.

21. The terms and conditions of the Motion, including the terms under which Midland States Bank will receive certain security interests, are fair and reasonable under the circumstances. Obtaining credit and incurring debt pursuant to the proposed Motion are actions reasonable and necessary to continue the Debtor's business operations and to preserve its bankruptcy estate. Thus, the Debtor believes that the entry of an order granting the interim and final relief requested in this Motion is in the best interests of its estate and creditors.

## Maintenance of Cash Management System

22. Debtor has requested authority to continue using its existing bank accounts, cash management system, and business forms in its *Emergency Motion for Order Authorizing Maintenance of Cash Management System, Continued Use of Certain Existing Bank Accounts, Deposit Practices, and Continued Use of Certain Business Forms* (the "**Bank Account Motion**").

23. Debtor's Cash Management System is composed of multiple accounts at multiple banks.

24. Four of the Debtor's accounts are maintained at Midland States Bank. On or about the Petition Date, account no. ****2250 with Midland States Bank contained a balance of $55,517.73. Account no. ****2250 serves as the main operating account for Debtor. Account no. ****2269 with Midland States Bank contained a balance of $108.95. Account no. ****2269 serves as a Raykel account. Account no. ****2242 with Midland States Bank contained a balance of $0.00. Account no. ****2242 serves as a payroll account. Account no. ****2226 with Midland States Bank contained a balance of $2,444.05. Account no. ****2226 serves as a NVP Hospitality account.

7

7441667v2

25. Four of the Debtor's accounts are maintained at First Bank. On or about the Petition Date, account no. ****2415 with First Bank contained a balance of $64,820.37. Account no. ****2415 serves as the main operating account for Debtor. Account no. ****2428 with First Bank contained a balance of $0.00. Account no. ****2428 serves as a payroll account. Account no. ****2431 with First Bank contained a balance of $1,573.63. Account no. ****2431 serves as an insurance account. Account no. ****0848 with First Bank contained a balance of $0.00. Account no. ****0848 serves as a NVP Hospitality account.

26. For its main operating account at First Bank, Debtor's Cash Management System operates as follows:

    a. Debtor issues checks and wire transfers out of its main operating account on a normal basis. Some payments are made utilizing the Federal Reserve wire transfer system or the automated clearing house (ACH) electronic funds transfer system. Debtor has check stock on site, and internet banking abilities that result in more reasonable service charges. Payments to vendors are made primarily using checks drawn on the main operating account. Certain vendors prefer payments made via ACH, which First Bank's internet service helps to facilitate.

27. Because of the nature of Debtor's Cash Management System, it would be difficult, disruptive and expensive for Debtor to close its existing accounts and open new accounts. Additionally, any disruption of the existing system would not only impair current operations, it would interrupt and delay financial reporting by Debtor to the Court because the existing internal accounting system is based on the availability of the data generated as a byproduct of the existing Cash Management System.

28. Maintaining Debtor's existing accounts will enhance reorganization efforts and lessen the confusion among employees, vendors, and potential customers that often follows a

8

Chapter 11 filing. Opening new bank accounts would be unduly burdensome, be disruptive to Debtor during this critical initial stage of the Chapter 11 process and may take several weeks to complete. Furthermore, Debtor has preprinted check stock that would require unnecessary time and expense to replace.

29. Debtor requests that its banks be authorized to honor all checks presented.

30. Unless Debtor is allowed to maintain its existing accounts, it will be unable to effect a smooth transition into its Chapter 11 proceeding. Maintenance of the existing accounts will not prejudice any party in interest. However, the inability to maintain existing accounts will prejudice Debtor, as well as its employees, vendors, and providers, as it may take approximately two weeks to receive new checks or may require time and expense in reprogramming certain printers and software. Accordingly, the entry of an order granting the relief requested is in the best interest of Debtor's estate, employees, and creditors.

### Business Necessity to Pay Pre-Petition Employee Claims

31. Debtor has requested authority to pay outstanding pre-petition Employee wages and benefits under the *Emergency Motion for Order Authorizing Payment of Pre-Petition Wages, Salaries, Reimbursable Employee Expenses and Medical and Other Employee Benefits* ("**Wage Motion**").

32. Debtor currently employs twenty-five (25) salaried employees. Debtor also employs seventy-nine (79) hourly employees, which include office staff and other necessary staff. All of the employees are full-time. All of these employees are on the payroll of, and paid by, Debtor. Debtor's employees are comprised of the following categories:

    a.    Exempt[1]:    25

---

[1] "Exempt" refers to employees who are exempt from wage and hour laws (i.e., professional and managerial employees).

  b.  Non-exempt[2]:  79

  c.  Total employees  104

33. The majority of employees are paid on an hourly basis. A smaller percentage of employees are paid on a salaried basis. All employees will suffer great hardship if they were to lose or suffer any delay in receiving their pay and/or benefits.

34. Failure to pay the pre-petition employee claims (the "**Pre-Petition Employee Claims**") as described and identified in the Wage Motion would cause Debtor's employees to suffer undue hardships and, in many instances, financial difficulties because such amounts are necessary to enable employees to meet their respective personal, household and family obligations. Such a result would obviously destroy employee morale and result in unmanageable employee turnover. The Debtor submits that any significant deterioration in morale at this time will substantially and adversely impact the Debtor and its ability to reorganize, thereby resulting in immediate and irreparable harm to the Debtor and its estate.

35. In addition, the Debtor believes that most, if not all, of the Pre-Petition Employee Claims will be entitled to priority status. Upon my information and belief, no single employee is owed more than $12,475.00 in total Pre-Petition Employee Claims. Thus, these employees will most likely be entitled to seek priority status for their claims under Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code.

36. To the extent that payment of the amounts described in the Wage Motion may subsequently be determined to be greater than a recipient thereof would otherwise have received if this case was commenced or proceeded under Chapter 7 of the Bankruptcy Code, Debtor (or

---

[2] "Non-exempt" refers to employees' status as not being exempt from wage and hour laws (i.e., production workers, clerical employees, and administrative staff).

7441667v2

any subsequently appointed Trustee) expressly reserves the right to seek recovery of such payments.

37. Debtor submits that the amounts to be paid to employees pursuant to the Wage Motion are reasonable compared with the importance and necessity of the services of the employees and the losses Debtor will likely suffer if those amounts are not paid.

38. The requested relief also will reduce significantly the administrative burden which otherwise might be imposed in the Chapter 11 case. For Debtor to identify whether and to what extent individual employees hold priority or general unsecured claims for employee benefits, and to modify benefit policies to enforce these distinctions, would impose additional burdens of administration and expense which seem unwarranted under the circumstances of these cases.

[Signature Page Follows]

7441667v2

FURTHER AFFIANT SAYETH NOT.

/s/ *Raymond O. Walter*
_____
Raymond O. Walter

STATE OF MISSOURI )
) SS.
COUNTY OF ST. LOUIS )

On this 19th day of May, 2014, before me, the undersigned, a Notary Public, in and for the County and State aforesaid, personally appeared **RAYMOND O. WALTER**, to me known to be the person described in and who executed the foregoing instrument, and acknowledged that she executed the same as her free act and deed.

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my official seal in St. Louis County, Missouri, the day and year last above written.

/s/ *Wendy M. Hickey*
_____
Notary Public in and for said County and State

My Commission Expires:    7/7/2014

7441667v2